IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| ARMECA O. HAYES-JACKSON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 09 C 3608 |
| v. | ) | |
| | ) | |
| J.P. MORGAN CHASE NATIONAL CORPORATE SERVICES, INC., a/k/a JP MORGAN CHASE BANK, | ) | JUDGE DAVID H. COAR |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Armeca Hayes-Jackson ("Plaintiff" or "Hayes-Jackson") brings this action against Defendant ChaseBankCard Services, Inc. ("Defendant" or "Chase"), improperly named as J.P. Morgan Chase National Corporate Services, Inc., alleging discrimination and retaliation in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000 *et seq.* Presently before the Court is Chase's motion for summary judgment on these claims. For the reasons stated below, Chase's motion for summary judgment is GRANTED.

## FACTUAL BACKGROUND

### I. Hayes-Jackson's Employment at Chase

Plaintiff, Hayes-Jackson, is an African-American woman who claims that her former employer, Chase, discriminated against her on the basis of her race. Hayes-Jackson began her employment with Chase at the company's Elgin, Illinois office in September 2002. (Defendant's Rule 56.1 Statement of Material Facts ("DSOF") ¶¶ 5, 7.) In November 2007, Hayes-Jackson assumed the role of Fraud Investigator I in Chase's Consumer Fraud Unit ("CFU"). (*Id.* ¶ 6.) From the time she began her employment as a fraud investigator until her termination, Hayes-

Jackson was directly supervised by Adam Bonk ("Bonk"), who is supervised by Steven Price ("Price"). (*Id.* ¶¶ 15, 17.) Both Bonk and Price are Caucasian males. (*Id.* ¶¶ 16, 18.)

As a fraud investigator, Hayes-Jackson's responsibilities included investigating Chase credit card customers' reports of fraudulent activity on their accounts to ensure that Chase did not sustain losses. (*Id.* ¶ 8.) Hayes-Jackson's job duties required her to engage in constant communication with Chase customers and merchants who accepted Chase-issued credit cards. (*Id.* ¶ 9.) Hayes-Jackson was randomly assigned cases by a computer program known as "Stoplight," and she was required to handle each case within 20 days after it was assigned to her. (*Id.* ¶¶ 10-11.) Additionally, under the CFU Call Handling Policy, "[a]ny messages left on voicemail requesting a callback should be responded to as soon as possible and must be returned **no more than 2 business days** from the date the message was left." (*Id.* at Ex. 8 (emphasis in original).) During her deposition, Hayes-Jackson testified that she believed she was required to respond to voicemails daily. (*Id.* ¶ 13.) Hayes-Jackson also acknowledged that her use of Chase's telephone system could be monitored and recorded. (*Id.* ¶ 14.)

## II. Alleged Instances of Discrimination

Hayes-Jackson claims that she experienced several instances of discrimination while she was employed by Chase. First, she claims that she was denied the opportunity to work overtime in the Recovery Phone Unit ("RPU") due to discrimination. On November 7, 2008, Price sent an e-mail to all CFU employees requesting that employees who were interested in working overtime in the RPU respond to his e-mail by Tuesday, November 11, 2008. (*Id.* ¶¶ 27-28.) Hayes-Jackson did not respond to this e-mail because she believed that the e-mail applied only to employees already in the RPU, and the e-mail did not mention training for the RPU overtime opportunity. (Plaintiff's Rule 56.1 Statement of Material Facts ("PSOF") ¶ 7). In fact, she only

discovered that the RPU training was taking place when she saw her co-workers coming and going from the training session. (Hayes-Jackson Dep. 42:9-19, Mar. 4, 2010.) After the training session concluded, Hayes-Jackson asked Bonk why she was not invited and whether she could still receive training. (Hayes-Jackson Dep. 43:9-24.; PSOF ¶ 8.) In response, Bonk explained that Hayes-Jackson failed to respond to Price's e-mail and would not be trained. (*Id.* ¶ 9.) Hayes-Jackson then approached Price to ask him why she was not invited to the RPU training and whether she could still be trained. (*Id.* ¶ 10.) According to Price, Hayes-Jackson did not approach him until after the RPU training session had already occurred. (DSOF Ex. 12, Price Aff. ¶ 10.) Price claims that all employees who had contacted him in advance, unlike Hayes-Jackson, were allowed to participate in the training session. (DSOF Ex. 12, Price Aff. ¶ 11.) In contrast, Hayes-Jackson alleges that Chase provided training to two non-African-American employees in her department who requested training after the session was held. However, Hayes-Jackson offers no admissible evidence to support this claim. In fact, evidence presented by Chase clearly establishes that one of the two employees named by Hayes-Jackson, Savannah Hernandez ("Hernandez"), had e-mailed Price expressing her interest in participating in the training session the day before it was held. (DSOF Ex. 12, Price Aff. ¶ 11, Ex. B.) Price responded to Hernandez's e-mail with permission to attend the training session. (*Id.*)

On several occasions during the fourth quarter of 2008, Hayes-Jackson raised concerns about her employment with Karen Kesner ("Kesner"), the Human Resources Business Partner aligned with Chase's credit card operation in Elgin. (DSOF ¶¶ 19, 31-32.) These concerns specifically related to: (1) a pay check issue, (2) Hayes-Jackson's assignment to field Fraud Application calls, and (3) the RPU training opportunity discussed above. With respect to the first issue, Hayes-Jackson believes that her pay check was docked inappropriately as a result of

racial discrimination. (*Id.* ¶ 32; *see also* PSOF ¶ 15.) After Hayes-Jackson brought this concern to Kesner's attention, the issue was addressed and resolved with Hayes-Jackson's supervisor and Chase's Human Resources Service Center.[1] (DSOF ¶ 33.) Hayes-Jackson also submitted concerns to Kesner about how accounts were assigned to fraud investigators. (*Id.* ¶ 32.) She claims that, on September 11, 2008, Bonk and Price informed her that she had to take Fraud Application ("FRAP") calls, and that if she did not, she would be "marked down in her operating principals." (PSOF ¶¶ 19-20.) Chase never trained Hayes-Jackson in taking FRAP calls. (*Id.* ¶ 21.) Hayes-Jackson claims that her non-African-American peers were not required to take FRAP calls, although she offers no evidence on this subject aside from her own testimony. (*Id.* ¶ 22.) In a meeting with Hayes-Jackson, Bonk, and Price, Kesner addressed Hayes-Jackson's concerns about how accounts were assigned and explained that most cases are assigned randomly through Chase's "Stoplight" system. (DSOF ¶ 34.) In response to concerns related to the RPU training opportunity, Bonk and Kesner met with Hayes-Jackson to clarify that the training was limited to employees who had responded to Price's November 7, 2008 e-mail or expressed interest in working overtime prior to the training session. (*Id.* ¶ 35.)

During her deposition, Hayes-Jackson raised several other allegations of discrimination. She testified that, after she returned from an approved period of FMLA leave, Bonk told her that her statistics were impacted negatively and that she descended from third rank in her department to the bottom of the list. (PSOF ¶ 25.) According to Hayes-Jackson, Bonk threatened to "mark down her operating principals" if her status continued to decline. (*Id.* ¶ 26.) Hayes-Jackson also testified that she approached Raymond Moss ("Moss"), Human Resources Site Lead and an African-American male, and complained of discrimination. (DSOF ¶¶ 21-22; PSOF ¶ 28.) She

---

[1] Chase offers no explanation as to how this issue was resolved, but Hayes-Jackson does not dispute that the issue was in fact resolved. (*See* DSOF ¶ 33.)

claims that Moss told her there was no such thing as discrimination and that he did not like the word "discrimination."  (PSOF ¶ 28.)  According to Hayes-Jackson, when she informed Moss two or three weeks later that she was still experiencing discrimination, Moss replied that he was too busy to investigate her claims and would get back to her later.

On December 9, 2008, Hayes-Jackson met with Kesner, Bonk, and Price to discuss ways to better communicate and address work issues in the future.  (PSOF ¶ 36.)  She was not satisfied with the results of this meeting and filed a charge of race discrimination with the EEOC in December 2008.  (*Id.* ¶¶ 37-38.)

### III. Hayes-Jackson's Assignment to the Business Fraud Unit

On February 4, 2009, Bonk assigned Hayes-Jackson to a temporary project supporting the Business Fraud Unit.  (DSOF ¶ 39.)  Hayes-Jackson claims that only she, Savannah Hernandez, and Anna Martinez—the only three minority employees in the department—were assigned to the Business Fraud Unit project.  (PSOF ¶¶ 31-32.)  Chase disputes this testimony and claims that Hayes-Jackson, Hernandez, and Martinez were not the only minority employees in Hayes-Jackson's department.  (*See* Def. Resp. to PSOF ¶ 32.)  As a result of her temporary assignment to the Business Fraud Unit, Hayes-Jackson was not required to take on new CFU cases between February 4, 2009 and March 3, 2009.  (DSOF ¶ 40.)  According to Chase, Hayes-Jackson was told to continue handling the cases that had been assigned to her before she began working with the Business Fraud Unit.  (*Id.* ¶ 41.)

Hayes-Jackson worked on the Business Fraud Unit project and received an "incentive check" for the month of February.  (PSOF ¶ 34.)  After continuing to work on the project throughout March, Hayes-Jackson returned to her regular department on April 1, 2009.  (PSOF ¶ 35.)  In early April 2009, Jill Norkus ("Norkus"), a Unit Specialist responsible for conducting

random call audits of CFU employees reporting to Bonk, performed a random monitor of Hayes-Jackson's voicemail activity. (DSOF ¶¶ 43, 45.) Norkus's review revealed that, on April 2, 2009, Hayes-Jackson had deleted 13 voice messages relating to her assigned CFU cases without taking any action or confirming that the cases had been investigated properly. (*Id.* ¶ 46.) Although deleted on April 2, 2009, these voicemails were left during February and March. (*Id.* at Ex.12, Price. Aff. Ex. E.) Clarence Dienberg ("Dienberg"), a Quality Analyst responsible for performing random call audits, performed further investigation on the audit of Hayes-Jackson's voicemail. (*Id.* ¶¶ 47, 49-50.) Dieberg's investigation established that several of the voicemails Hayes-Jackson had deleted related to cases assigned to her before she began working in the Business Fraud Unit, and some related to cases assigned to Hayes-Jackson as early as December 10, 2008. (*Id.* ¶ 51; *see id.* at Ex.12, Price. Aff. Ex. E.) According to Chase, Hayes-Jackson's conduct constituted a major violation of Chase policy, which requires follow-up on voicemails within 48 hours and proper investigation of cases within 20 days after they are assigned. (*Id.* ¶¶ 11-12, 52-53.) Bonk and Kesner claim that Hayes-Jackson's violations of Chase policy led them to draft a Recommendation for Termination ("RFT") of Hayes-Jackson's employment. (*Id.* ¶ 53.) The RFT set forth the following reason for Hayes-Jackson's proposed termination:

> During the 2nd week of April 2009, a call review was conducted. The recording showed gross negligence on behalf of the employee by deleting customer messages without proper follow-up. Armeca Hayes-Jackson has violated the Employee Code of Conduct by engaging in ethical behavior.

(*Id.* ¶ 54.) Hayes-Jackson's RFT was reviewed and approved by Price, Bonk, and Kesner, who then met with Hayes-Jackson together on April 20, 2009. (*Id.* ¶¶ 55-56.) During this meeting, a recording of Hayes-Jackson deleting the messages was played. (*Id.* ¶ 57.) Bonk and Price claim that Hayes-Jackson failed to provide any plausible reason to explain why she deleted the messages, leading to her termination at the conclusion of the meeting. (*Id.* ¶¶ 58-59.)

Hayes-Jackson provides a different account of the April 20 meeting and her explanation for deleting the voicemails at issue. She claims that, when she was confronted about the messages she deleted, she explained that Bonk had instructed her not to work on her accounts once she began her temporary assignment in the Business Fraud Unit. (PSOF ¶¶ 35, 39.) According to Hayes-Jackson, Bonk informed her that her accounts would be handled by her peers and told her explicitly to delete her messages. (PSOF ¶¶ 36-39.) In support of her testimony, Hayes-Jackson both recounted her conversations with Bonk and pointed to an e-mail Bonk sent her on February 11, 2009, which states: "Going forward for the rest of February, you are not required to submit an exception sheet to the Elgin FPD US mail box." (*Id.* ¶ 37.) Hayes-Jackson explained that "exception sheets" track how employees spend their hours, and she interpreted Bonk's e-mail to mean that she was exempt from working on her CFU cases since she would be spending all of her time on the Business Fraud Unit project. (*Id.*) Hayes-Jackson testified that, when she mentioned Bonk's e-mail during the April 20 meeting, Kesner initially responded that she would like to see the e-mail, but once Hayes-Jackson got up to retrieve the e-mail, Kesner retreated and stated: "You know what, it's basically whatever they say." (*Id.* ¶ 40.) Hayes-Jackson maintains that her termination was the result of a conspiracy against her. (DSOF ¶ 60.)

Hayes-Jackson filed a second charge of discrimination with the EEOC on May 4, 2009, alleging that Chase terminated her in retaliation for filing her initial charge of discrimination with the EEOC in December 2008. (*Id.* ¶ 74.)

## IV. Betty Metallo

To support its argument that Hayes-Jackson was treated no differently than similarly

situated non-African-American employees, Chase submits evidence on the termination of Betty Metallo ("Metallo"), a Caucasian fraud investigator. (*Id.* ¶¶ 61-62.) Metallo was employed by Chase as a fraud investigator in the CFU until her termination in the spring of 2009. (*Id.* ¶ 62.) Her direct supervisor at Chase was Lenore Jackson ("Jackson"). (*Id.* ¶ 63.) On March 2, 2009, Metallo volunteered to work on a temporary Business Fraud Unit project, which was similar to Hayes-Jackson's temporary project in that department. (*Id.* ¶ 64.) Metallo did not receive any new CFU cases, but was required to continue handling the CFU cases that had been assigned to her prior to March 2, 2009. (*Id.* ¶ 65.) On or about March 20, 2009, a routine check of Metallo's call log revealed that, on March 12, 2009, Metallo deleted 18 out of 19 voicemails before taking any action to confirm that the cases had been investigated properly. (*Id.* ¶ 66.) When Dienberg performed a follow-up investigation, he determined that at least some of the deleted messages related to cases assigned to Metallo before March 2, 2009. (*Id.* ¶ 68; *see id.* at Ex.12, Price. Aff. Ex. F.) (It appears that the other messages could not be traced to specific cases. (*See id.*)) Based on the information discovered during the investigation of Metallo's conduct, Jackson (Metallo's direct supervisor) and Kesner (the same human resources employee involved in Hayes-Jackson's case) worked together to draft a Recommendation for Termination ("RFT") of Metallo's employment. (*Id.* ¶ 69.) The language of Metallo's RFT mirrored the language of Hayes-Jackson's and stated specifically:

> On March 20, 2009, a phone monitor was conducted. The recording showed gross negligence on behalf of the employee by deleting customer messages. Betty Metallo has violated the Employee Code of Conduct by engaging in unethical behavior.

(*Id.* ¶ 70.) Metallo's RFT was reviewed and approved by Jackson, Price, and Kesner, and she was ultimately terminated. (*Id.* ¶ 71.)

**LEGAL STANDARD**

Summary judgment is appropriate if "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). A genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The party seeking summary judgment bears the burden of establishing that no genuine issue of material fact exists. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). If the movant meets this burden, the non-movant must set forth specific facts (a "scintilla of evidence" is insufficient) demonstrating that there is a genuine issue for trial. Fed. R. Civ. P. 56(e); *Anderson*, 477 U.S. at 252.

When reviewing a motion for summary judgment, the court must view the facts in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor. *See Schuster v. Lucent Tech., Inc.*, 327 F.3d 569, 573 (7th Cir. 2003). At summary judgment, the "court's role is not to evaluate the weight of the evidence, to judge the credibility of witnesses, or to determine the truth of the matter, but instead to determine whether there is a genuine issue of triable fact." *Nat'l Athletic Sportswear, Inc. v. Westfield Ins. Co.*, 528 F.3d 508, 512 (7th Cir. 2008).

**ANALYSIS**

**I.      Discrimination**

Under Title VII of the Civil Rights Act of 1964, it is unlawful for an employer to discriminate against an employee "with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national

origin." 42 U.S.C. § 2000e-2(a)(1). A plaintiff can support a claim for discrimination under Title VII either by presenting evidence of discrimination (the "direct method" of proof), or by employing the burden-shifting approach set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973) (the "indirect method"). *Darchak v. City of Chicago Bd. of Educ.*, 580 F.3d 622, 630 (7th Cir. 2009).

Regardless of whether a plaintiff proceeds by the direct or indirect method, she must demonstrate that she has suffered a "materially adverse employment action." *Rhodes v. Ill. Dept. of Transp.*, 359 F.3d 498, 504 (7th Cir. 2004). It is helpful at the outset to define which of Hayes-Jackson's various claims of discrimination are legally actionable (i.e., "materially adverse employment actions"). To do so, the Court must "distinguish between material differences and the many day-to-day travails and disappointments that, although frustrating, are not so central to the employment relation that they amount to discriminatory terms or conditions." *Minor v. Centocor, Inc.*, 457 F.3d 632, 634 (7th Cir. 2006). A materially adverse employment action is "more than a mere inconvenience or an alteration of job responsibilities." *Oest v. Ill. Dep't of Corr.*, 240 F.3d 605, 612 (7th Cir. 2001) (citation and quotation marks omitted). Rather, "an adverse employment action is a significant change in the claimant's employment status such as hiring, discharge, denial of promotion, reassignment to a position with significantly different job responsibilities, or an action that causes a substantial change in benefits." *Rhodes*, 359 F.3d at 504. Additionally, adverse employment actions might involve shifting an employee's function in a way that "significantly reduces the employee's career prospects by preventing him from using the skills in which he is trained and experienced" or subjecting an employee to workplace conditions that "can be fairly characterized as objectively creating a hardship." *Tart v. Ill. Power Co.*, 366 F.3d 461, 475 (7th Cir. 2004).

The sole claim that constitutes a "materially adverse employment action" in this case is Hayes-Jackson's termination. *See Rhodes*, 359 F.3d at 504. None of her other claims are similarly actionable. Although Hayes-Jackson contends that Chase docked her pay checks inappropriately due to discrimination, it is undisputed that Chase addressed and remedied her concerns about her pay checks. Hayes-Jackson fails to explain how this incident, which was ultimately resolved, constitutes a materially adverse employment action. Hayes-Jackson's next claim is equally insufficient. Here, she claims that, unlike her non-African-American peers, she was assigned to take Fraud Application calls without training. Hayes-Jackson offers no admissible evidence to demonstrate that she was treated differently than her non-African-American peers in this regard, and she fails to explain how the assignment in question constitutes "more than a mere inconvenience or an alteration of job responsibilities." *Oest*, 240 F.3d at 612. Next, Hayes-Jackson claims that Bonk told her that her statistics were impacted negatively while she was on FMLA leave. However, Hayes-Jackson does not contend—let alone offer evidence—that her statistics actually did decline. Similarly, while Hayes-Jackson asserts that Bonk threatened to "mark down her operating principals" if her statistics suffered, she offers no argument or evidence that Bonk followed through with his alleged threat.

Hayes-Jackson's subsequent claims that she suffered materially adverse employment actions when she was denied RPU overtime training and assigned to the Business Fraud Unit fare no better. Although it is plausible that denial of a training opportunity may constitute actionable discrimination under some circumstances, here, it did not. As explained above, Chase offered training only to employees who expressed interest in a timely fashion. Hayes-Jackson was not provided with training because she did not voice her interest prior to the training session, and she offers no evidence that she was treated any differently from her non-African-American

peers in this regard. With respect to Hayes-Jackson's temporary assignment to the Business Fraud Unit, the parties may genuinely dispute whether Chase staffed the department's only three minority employees on this project. However, this dispute is immaterial, as Hayes-Jackson fails to establish that her temporary assignment significantly changed her employment status, *see Rhodes*, 359 F.3d at 504, or constituted "more than . . . an alteration of job responsibilities." *Oest*, 240 F.3d at 612. To the contrary, Hayes-Jackson claims that she performed well in the Business Fraud Unit and "received an incentive check" as a result. (PSOF ¶ 33; Hayes-Jackson Dep. 60:1-6.) Ultimately, of the various discriminatory incidents Hayes-Jackson alleges she experienced, the only one that constitutes a "materially adverse employment action" is her termination. Although Hayes-Jackson is free to raise any of the other incidents (deficient as they may be) *to support* her claim that she was terminated because of her race, none is independently actionable. With that in mind, the Court proceeds to consider whether Hayes-Jackson can survive summary judgment by proving that she was terminated due to racial discrimination under either the direct or indirect method.

      **a. Direct Method**

Under the direct method, a plaintiff may prevail at summary judgment by presenting evidence from which a jury could find that discrimination motivated the adverse employment action at issue. *Jones v. City of Springfield, Ill.*, 554 F.3d 669, 671 (7th Cir. 2009). Despite the name, "direct method," a plaintiff proceeding under this method may present either direct or circumstantial evidence that an employer acted based on discriminatory animus. *See Nagle v. Vill. of Calumet Park*, 554 F.3d 1106, 1114 (7th Cir. 2009); *Atanus v. Perry*, 520 F.3d 662, 671 (7th Cir. 2008). Direct evidence "will prove the particular fact in question without reliance upon inference or presumption" and usually requires a decisionmaker's admission of discriminatory

peers in this regard. With respect to Hayes-Jackson's temporary assignment to the Business Fraud Unit, the parties may genuinely dispute whether Chase staffed the department's only three minority employees on this project. However, this dispute is immaterial, as Hayes-Jackson fails to establish that her temporary assignment significantly changed her employment status, *see Rhodes*, 359 F.3d at 504, or constituted "more than . . . an alteration of job responsibilities." *Oest*, 240 F.3d at 612. To the contrary, Hayes-Jackson claims that she performed well in the Business Fraud Unit and "received an incentive check" as a result. (PSOF ¶ 33; Hayes-Jackson Dep. 60:1-6.) Ultimately, of the various discriminatory incidents Hayes-Jackson alleges she experienced, the only one that constitutes a "materially adverse employment action" is her termination. Although Hayes-Jackson is free to raise any of the other incidents (deficient as they may be) *to support* her claim that she was terminated because of her race, none is independently actionable. With that in mind, the Court proceeds to consider whether Hayes-Jackson can survive summary judgment by proving that she was terminated due to racial discrimination under either the direct or indirect method.

      **a. Direct Method**

Under the direct method, a plaintiff may prevail at summary judgment by presenting evidence from which a jury could find that discrimination motivated the adverse employment action at issue. *Jones v. City of Springfield, Ill.*, 554 F.3d 669, 671 (7th Cir. 2009). Despite the name, "direct method," a plaintiff proceeding under this method may present either direct or circumstantial evidence that an employer acted based on discriminatory animus. *See Nagle v. Vill. of Calumet Park*, 554 F.3d 1106, 1114 (7th Cir. 2009); *Atanus v. Perry*, 520 F.3d 662, 671 (7th Cir. 2008). Direct evidence "will prove the particular fact in question without reliance upon inference or presumption" and usually requires a decisionmaker's admission of discriminatory

animus. *Nagle*, 554 F.3d at 1114 (quoting *Rudin v. Lincoln Land Cmty. Coll.*, 420 F.3d 712, 720 (7th Cir. 1998)) (internal quotation marks omitted). Because such admissions are rare, *see Nagle*, 554 F.3d at 1114, a plaintiff may also proceed under the direct method by offering circumstantial evidence that "suggests discrimination through a longer chain of inferences." *Atanus*, 520 F.3d at 671 (quoting *Lux v. Baxter Healthcare Corp.*, 467 F.3d 1049, 1053 (7th Cir. 2006)) (internal quotation marks omitted). To succeed under this approach, the plaintiff must "construct[] a 'convincing mosaic' of circumstantial evidence that 'allows a jury to infer intentional discrimination by the decision-maker.'" *Rhodes*, 359 F.3d at 504 (quoting *Troupe v. May Dep't Stores Co.*, 20 F.3d 734, 737 (7th Cir. 1994)). At bottom, regardless of whether the plaintiff presents direct or circumstantial evidence, the direct method of proof focuses on "whether the evidence 'points directly' to a discriminatory reason for the employer's action." *Atanus*, 520 F.3d at 672 (quoting *Sylvester v. SOS Children's Vills. Ill., Inc.*, 453 F.3d 900, 902-03 (7th Cir. 2006)).

As an initial matter, Hayes-Jackson offers no direct evidence of discrimination. She does not claim that anyone at Chase discriminated against her overtly, nor does she allege that her supervisors admitted to treating her adversely because of her race. Rather, she proceeds under the direct method by arguing that a "convincing mosaic" of circumstantial evidence supports her claim for discrimination. Hayes-Jackson offers the following circumstantial evidence in furtherance of her claim: (1) she believes her paychecks were inappropriately docked due to racial discrimination; (2) unlike her non-African-American peers, she was assigned to take Fraud Application calls without training; (3) she was denied RPU overtime training that her non-African-American co-workers received; (4) when she complained to Human Resources that she experienced discrimination, the Human Resources manager told her that he did not believe in

discrimination; (5) thirty-five days after she filed a charge of discrimination with the EEOC, the only three minority employees in the department, including Hayes-Jackson, were assigned to a special project in the Business Fraud unit; and (6) this assignment was part of a racially motivated conspiracy that ultimately led to her termination. In addition to the various other deficiencies in these allegations, as discussed above, none "points directly" to a discriminatory motivation for Hayes-Jackson's termination. *Atanus*, 520 F.3d at 672. Hayes-Jackson therefore cannot survive summary judgment under the direct method.

### b. Indirect Method

Hayes-Jackson next proceeds under the indirect method. Under this method, a plaintiff establishes a prima facie case of discrimination by demonstrating that: "(1) she is a member of a protected class, (2) her job performance was meeting her employer's legitimate expectations, (3) she was subject to a materially adverse employment action, and (4) the employer treated similarly situated employees outside the protected class more favorably." *Winsley v. Cook County*, 563 F.3d 598, 604 (7th Cir. 2009). If Hayes-Jackson can make out a prima facie case, the burden of production shifts to Chase to offer a "permissible, nondiscriminatory reason" for her termination. *McGowan v. Deere & Co.*, 581 F.3d 575, 579 (7th Cir. 2009). If Chase can do so, the burden shifts back to Hayes-Jackson to show that Chase's stated reason is "merely a pretext for discrimination, i.e., a lie." *Id.* Notwithstanding these shifting burdens, Hayes-Jackson bears the ultimate burden of persuading the trier of fact that Chase intentionally discriminated against her on the basis of her race. *Id.*

The first and third prongs of the prima facie analysis are not at issue. Hayes-Jackson is African-American and therefore belongs to a protected class, and as discussed above, the only

materially adverse employment action at issue is Hayes-Jackson's termination. The parties' remaining disputes involve the second and fourth prongs as well as the pretext analysis.

The Court begins with the second prong. The analysis here focuses on whether Hayes-Jackson was meeting Chase's legitimate employment expectations at the time of her termination. *See Peele v. Country Mut. Ins. Co.*, 288 F.3d 319, 328 (7th Cir. 2002). Chase submits that she clearly was not. It is undisputed that Chase's policy required Hayes-Jackson to return voicemails within 48 hours and handle all cases within 20 days after they are assigned. Hayes-Jackson admits that, on April 2, 2009, she deleted 13 voicemails without taking any action or confirming that someone else had. Rather, she claims that, when she was temporarily reassigned to the Business Fraud Unit, Bonk (her supervisor) instructed her that she was no longer responsible for her CFU cases, that they would be transferred to other employees, and that she could therefore delete the voicemails at issue. According to both Bonk and Price, while Hayes-Jackson was not assigned new cases during her temporary assignment to the Business Fraud Unit, she was still charged with handling cases that had been delegated to her before this assignment. Perhaps the parties genuinely dispute Hayes-Jackson's responsibilities with respect to her existing cases during her temporary assignment. However, the Court need not resolve this issue. Even if Hayes-Jackson was not responsible for previously assigned cases while she was working for the Business Fraud Unit, the record shows that she blatantly violated Chase's policies before she was even assigned to the Business Fraud Unit. On April 2, 2009, Hayes-Jackson deleted several February and March messages that related to cases assigned to her as early as December 10, 2008. Under Chase policy, these cases should have been resolved long before Hayes-Jackson's reassignment to the Business Fraud Unit on February 4, 2009. Hayes-Jackson does not contest or attempt to explain this evidence. She therefore fails to demonstrate that she was meeting

Chase's legitimate employment expectations at the time of her termination. Hayes-Jackson's failure on this front is enough to defeat her prima facie case and support summary judgment for Chase. Nevertheless, the Court notes that Hayes-Jackson cannot satisfy the fourth prong of her prima facie case either.

With respect to the fourth prong, Hayes-Jackson first argues that she is not required to identify a similarly situated non-African-American employee who Chase treated more favorably. *See Leffel v. Valley Fin. Serv.*, 113 F.3d 787, 193-94 (7th Cir. 1997). Acknowledging that "the nature of the proof giving rise to the requisite inference of discrimination cannot be reduced to a formula that will serve any and all discrimination cases," the Seventh Circuit in *Leffel* permitted the fourth prong to be replaced with a showing that "the circumstances surrounding [the plaintiff's] probation and discharge indicate that it is more likely than not that her disability was the reason for these adverse actions." *Id.* at 793-94. (The plaintiff in *Leffel* complained of discrimination in violation of the Americans with Disabilities Act.) In cases after *Leffel*, the Seventh Circuit has noted that "this alternative formulation is hardly a true version of the test," yet "whatever evidence or method of proof the plaintiff resorts to, he must put together a case that permits the inference that the employer has acted against him based on his disability." *Timmons v. Gen. Motors Corp.*, 469 F.3d 1122, 1126-27 (7th Cir. 2006). Chase properly points out that, even more recently, the Seventh Circuit has returned to applying the unadulterated version of the fourth prong, which requires the court to reject a discrimination claim where a plaintiff cannot show that her employer treated similarly situated employees outside of her protected class more favorably. *See, e.g.*, *Egonmwan v. Cook County Sheriff's Dep't*, 602 F.3d 845, 849 (7th Cir. 2010); *Antonetti v. Abbott Labs.*, 563 F.3d 587, 592 (7th Cir. 2009) ("Without

a similarly situated employee, Plaintiffs cannot present a prima facie case and their claim must fail.").

Under either the modified fourth prong articulated in *Leffel* or the original standard (which the Court deems more appropriate here), Hayes-Jackson's claim is doomed; she cannot show that it is more likely than not that she was terminated because of discrimination, nor can she name a similarly situated non-African-American employee who Chase treated more favorably than her. Rather than identifying such an employee, Hayes-Jackson focuses on drawing distinctions between herself and Betty Metallo. In support of its motion for summary judgment, Chase argues that Metallo, a similarly situated Caucasian employee, was treated no differently than Hayes-Jackson. Metallo, a CFU employee temporarily assigned to the Business Fraud Unit, returned to her regular department and promptly deleted 18 voicemails without taking proper action. Like Hayes-Jackson, she was terminated for "gross negligence" in violation the Employee Code of Conduct. (DSOF ¶¶ 54, 70.) In opposition to Chase's motion, Hayes-Jackson expends considerable ink distinguishing her situation from Metallo's, apparently attempting to satisfy the fourth prong of her prima facie case. However, this effort is misguided. Chase is not required to identify a similarly situated non-African-American employee who was not treated more favorably than Hayes-Jackson; rather, Hayes-Jackson bears the burden of producing a similarly situated non-African-American employee who *was* treated more favorably. *See Winsley*, 563 F.3d at 604. She has failed to do so. Because Hayes-Jackson cannot satisfy either the second or fourth prong necessary to establish a prima facie case, the Court must reject her claim of discrimination.[2]

---

[2] Because Hayes-Jackson fails to establish a prima facie case of discrimination, the Court need not consider whether Chase's explanation is really pretext for discrimination. *See Antonetti*, 563 F.3d at 592 n.6. In any event, to demonstrate pretext, "a plaintiff must show that (1) the employer's non-discriminatory reason was dishonest and (2) the employer's reason was based on a discriminatory intent." *Stockwell v. City of Harvey*, 597 F.3d 895, 901 (7th

## II. Retaliation

Hayes-Jackson's claim that Chase retaliated against her by terminating her employment after she filed a charge of race discrimination with the EEOC also falls short.[3] As with other discrimination claims, a plaintiff can establish a prima facie case of retaliation through either the direct or indirect method. *Antonetti*, 563 F.3d at 592. Here, Hayes-Jackson relies on the indirect method. Under the indirect method, a plaintiff must show that "she engaged in statutorily protected activity, performed her job to her employer's legitimate expectations, suffered an adverse employment action, and was treated less favorably than similarly situated employees who did not engage in that protected activity." *Everroad v. Scott Truck Sys., Inc.*, 604 F.3d 471, 481 (7th Cir. 2010). As with her claim of discrimination, Hayes-Jackson fails to satisfy both the second and fourth prongs of her prima facie case of retaliation. Accordingly, the Court must reject Hayes-Jackson's retaliation claim.

## CONCLUSION

For the reasons stated above, Defendant's motion for summary judgment is GRANTED.

Enter:
/s/ David H. Coar

_____
David H. Coar
United States District Judge

**Dated:** June 22, 2010

---

Cir. 2010) (citation and quotation marks omitted). Even if the Court were to reach this analysis, Hayes-Jackson offers no evidence demonstrating that Chase's explanation for her termination is pretext for racial discrimination. In short, Hayes-Jackson has not demonstrated that Chase intentionally discriminated against her because of her race, even if she could make out a prima facie case of race discrimination.

[3] Hayes-Jackson also argues that Chase retaliated against her by temporarily assigning the only three minority employees in her department, including her, to the Business Fraud Unit. As discussed above, Hayes-Jackson cannot establish that this reassignment constitutes a "materially adverse employment action." Therefore, the Court's analysis of Hayes-Jackson's retaliation claim is limited to whether Chase retaliated against her in violation of Title VII by terminating her employment.